IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

No._____

| | | |
|---|---|---|
| LESLIE LINCOLN<br>  Plaintiff, | ) ) ) | |
| | ) | **CIVIL COMPLAINT** |
| v. | ) ) | |
| | ) | **JURY TRIAL** |
| CITY OF GREENVILLE POLICE DEPARTMENT, | ) | **DEMANDED** |
| PITT COUNTY, JOSEPH M. SIMONOWICH, IN HIS | ) | |
| INDIVIDUAL AND OFFICIAL CAPACITIES, DAVID | ) | |
| R. "RICKY" BEST, IN HIS INDIVIDUAL AND | ) | |
| OFFICIAL CAPACITIES, DISTRICT ATTORNEY | ) | |
| WILLIAM CLARK EVERETT, IN HIS INDIVIDUAL | ) | |
| AND OFFICIAL CAPACITIES, KIMBERLY ROBB, | ) | |
| IN HER INDIVIDUAL AND OFFICIAL CAPACITIES, | ) | |
| BRENDA BISSETTE, IN HER INDIVIDUAL AND | ) | |
| OFFICIAL CAPACITIES, AND THE NORTH | ) | |
| CAROLINA STATE BUREAU OF INVESTIGATION | ) | |
|   Defendants. | ) ) | |

## COMPLAINT

-1-

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF THE ACTION............................................ 3

PARTIES.................................................................................................. 3

JURISDICTION AND VENUE .......................................................................... 5

FACTS ....................................................................................................6

COUNT ONE ...........................................................................................20
NEGLIGENCE

COUNT TWO............................................................................................ 22
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

COUNT THREE......................................................................................... 22
NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

COUNT FOUR ..........................................................................................23
NEGLIGENT SUPERVISION OF EMPLOYEES
(Against Defendants Simonowich, Everett, Greenville, Pitt County, and Police Department)

COUNT FIVE............................................................................................ 26
FALSE PUBLIC STATEMENTS IN VIOLATION OF 42 U.S.C. § 1983

COUNT SIX ............................................................................................27
VIOLATION OF AND CONSPIRACY TO VIOLATE FOURTEENTH AMENDMENT
RIGHTS UNDER 42 U.S.C. § 1983 – MALICIOUS INVESTIGATION

PRAYER FOR RELIEF ................................................................................27

JURY TRIAL DEMAND................................................................................ 28

## INTRODUCTION AND SUMMARY OF THE ACTION

1.       This action is brought for damages by Leslie Lincoln. In the Spring of 2002 Joseph Simonowich was chief of police in Greenville, North Carolina, while David R. Best worked under him as a detective. William Clark Everett was the district attorney with assistant district attorney Kimberly Robb under his supervision.

2.       At the same time, Leslie Lincoln, having endured a stressful, arduous divorce was in the process of healing and moving her life forward. As the director of a nursing home in Greenville, she was able to purchase a new home and pursue her interests. In addition to the usual plethora of household pets, such as cats and dogs, Leslie was an avid equestrian and was at a place in her life where she could afford the time and the money to maintain and enjoy her three horses. She was living her American Dream.

3.       Her world shattered with the murder of her mother on St. Patrick's Day Sunday, 2002. As if things could not get worse, six months later she was charged with her mother's murder. She lost her job, she lost her home, she lost her reputation, she lost everything for which she spent a lifetime preparing and working. To this day, she has not recovered.

4.       Ms. Lincoln's ordeal is the result of sloppy investigation, failure to properly oversee and supervise a murder investigation, failure to properly oversee and supervise an assistant district attorney, and failure to maintain proper lab procedures and standards leading to false DNA results.

## PARTIES

**I.       The Plaintiff.**

Plaintiff Leslie Lincoln is a citizen and resident of Pitt County, North Carolina.

**II.       The Defendants.**

5. Upon information and belief, Defendant City of Greenville Police Department, is a duly authorized North Carolina law enforcement agency with its principal office in Greenville, Pitt County, North Carolina.

6. Upon information and belief, Defendant Pitt County, North Carolina ("Pitt County") is a duly authorized North Carolina governmental municipality, operating under the authority of the laws and Constitution of North Carolina.

7. Upon information and belief, Pitt County, and Greenville Police Department all have insurance and have waived any applicable governmental immunity by acquiring said insurance.

8. Defendants Joseph Simonowich ("Simonowich"), David R. "Ricky" Best ("Best"), William Clark Everett ("Everett"), and Kimberly Robb ("Robb") are, upon information and belief, citizens and residents of Pitt County, North Carolina. They are being sued in their individual capacities, and in their official capacities.

9. Defendant, Brenda K. Bissette, upon information and belief, is a citizen and resident of Nash County, North Carolina. She too is being sued in her individual capacities, and in her official capacities.

10. At all times relevant herein, Simonowich was a law enforcement officer employed at that time, as the Chief of Police by the Greenville Police Department, acting in the course and scope of his employment. At all times relevant herein, Simonowich was acting under the color of law in his employment as Chief of Police for Greenville, employed by the Greenville Police Department.

11. At all times relevant herein, Best was a law enforcement officer employed by Police Department, acting in the course and scope of his employment. At all times relevant to

-4-

this Complaint, Best was acting under the color of law in his employment as a North Carolina police officer for Greenville, employed by the Police Department and Greenville.

12. At all times relevant herein, Everett was the district attorney employed by Pitt County, acting in the course and scope of his employment. At all times relevant to this Complaint, Everett was acting under the color of law in his employment as a North Carolina district attorney for Pitt County.

13. At all times relevant herein, Robb was an assistant district attorney employed by Pitt County, acting in the course and scope of her employment. At all times relevant to this Complaint, Robb was acting under the color of law in her employment as a North Carolina assistant district attorney for Pitt County, employed by the Pitt County District Attorney. In addition, at all times relevant herein, Robb stepped outside her role as a prosecutor and worked as an investigator for the City of Greenville, and Police Department.

14. Defendant North Carolina State Bureau of Investigation ("SBI") is a division of the Department of Justice with its headquarters located in Wake County, North Carolina. The SBI has statewide jurisdiction and investigates homicides, robberies, property crimes, and other serious cases.

15. Defendants City of Greenville Police Department, Best, Pitt County, Everett, Simonowich and SBI are sued under 42 U.S.C. 1983 for engaging in a pattern or practice of allowing officers and subordinates to engage in the improper actions alleged herein; and for *inter alia* failing to properly train officers and subordinates in proper techniques and procedures. They are also sued under the doctrine of *respondeat superior* as the individual Defendants were often acting in the course and scope of their official duties when they engaged in the actions alleged herein.

-5-

## JURISDICTION AND VENUE

16. This action for damages arises under the Constitution and laws of the United States as well as the law of the State of North Carolina. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 42 U.S.C. § 1983. This Court has supplemental jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367.

17. Venue is proper in the Eastern District of North Carolina pursuant to 28 U.S.C. § 1391. Nearly all defendants reside and may be found in the Eastern District of North Carolina and a substantial part of the events giving rise to these claims occurred in this district.

## FACTS

18. On March 17, 2002 at approximately 12:30 p.m., Duffy Lincoln, Plaintiff's brother, visited Plaintiff's mother, Arlene Lincoln, with his four children, three sons and a daughter. This visit lasted until approximately 4:00 p.m.

19. Later that same evening, Plaintiff left her home near Farmville, on Stantonsburg Highway, and drove the approximate 9 miles into Greenville. As she entered Greenville, she purchased $25 worth of gasoline for her truck.

20. Plaintiff then drove to Circuit City, where at 5:58 p.m. she purchased a couple of CDs. Plaintiff then visited with her mother Arlene Lincoln until approximately 7:30 p.m. that evening. After this visit, Plaintiff went to Wal-Mart, where she wrote a check for her purchases. Plaintiff then went home. There was nothing unusual in Plaintiff's phone calls, her cell phone, or any other record during this time.

21. After Plaintiff left her mother's apartment, someone came into the apartment, got into a brutal fight with Arlene Lincoln, and stabbed her in the neck. Arlene Lincoln was killed.

There was evidence that Arlene Lincoln fought viciously with her attacker, as there were a multitude of injuries on Arlene Lincoln's body.

22.     Inside Arlene Lincoln Lincoln's apartment, her killer left four $1 bills on the living room couch after Arlene Lincoln was killed. Very little was disturbed in the apartment. However, Arlene Lincoln's purse was disturbed on the couch near the four bills, and her eyeglasses were on the floor. In the bedroom where Arlene Lincoln was killed was a small drawer placed on the floor near the dresser. Arlene Lincoln's body lay in massive amounts of blood on the floor beside her bed, her eyes wide open.

23.     The police did not check the dollar bills for fingerprints until requested to do so by the defense. Two of the police officers looked at the purse that evening and then gave it back to the family. They did not process it for fingerprints. Any fingerprints or other evidence from the purse was lost due to the Police Department's failure to process the purse at that time.

24.     The bed beside which Arlene Lincoln laid was covered with a white bed sheet. On this sheet were significant amounts of blood, which as detailed herein, were also misidentified as containing Plaintiff's DNA due to law enforcement misconduct.

25.     In the blood were one or more footprints which were never measured by Defendant Best or Defendant Police Department.

26.     At 3:55 a.m. on the morning of Monday, March 18, 2002, someone used Arlene Lincoln's credit card at the Handy Mart 54 located near the intersection of Firetower and Charles Blvd. in the Bell Forks area of Greenville. A video was recovered from this store; however Defendant Best and the Greenville police either lost or destroyed the store video.

-7-

27.     Arlene Lincoln's murder was discovered the next day by her son, Duffy Lincoln. His wife called Plaintiff at that time. As soon as Plaintiff received the call, she rushed over to Arlene Lincoln's apartment. By the time Plaintiff arrived, the police were already there.

28.     The police performed an inadequate investigation of Arlene Lincoln's murder. Three days into the investigation the police replaced the lead investigator with Defendant Best.

29.     A few days after Arlene Lincoln's death, the police allowed the family back into the apartment. The police knew that Arlene Lincoln fought with her assailant. The also knew the assailant had to have suffered injuries in the attack. All family members, including the Plaintiff and her brother were checked for injuries in conformity with their information. Neither Plaintiff, nor Duffy, nor anyone else examined that evening had any signs of injury.

30.     The police asked Plaintiff to gather information of other people who lived in the neighborhood and Plaintiff complied. Plaintiff delivered the requested information to Defendant Best on Friday, March 22, 2002. Best interrogated her for several hours that same evening.

31.     Defendant Best immediately concluded that Plaintiff was guilty and badgered her during the interrogation. Best located Plaintiff's boyfriend and met with him a few days later. On March 28, 2002, Best met with Plaintiff again. Nothing in these interviews led Best to arrest Plaintiff, search her truck, or take any additional steps.

32.     Defendant Best investigated Arlene Lincoln's murder for approximately another month and then stopped the investigation with very little in his notes from April through August of 2002.

33.     In August of 2002, an employee from Plaintiff's nursing home called Best and said that she had heard rumors. Best talked to this employee. Within a month of this

-8-

conversation, Best, in consultation with Defendant Robb arrested Plaintiff on September 19, 2002.

34.     This was the first felony criminal charge ever faced by Plaintiff. On the date of Plaintiff's arrest, Best executed a search warrant and seized what he believed to be trace evidence from Plaintiff's truck. On the same date, Best also executed a search warrant on Plaintiff's home and seized a number of items. None of this evidence linked Plaintiff to any crime. This did not deter Best or Robb.

35.     On September 20, 2002, Best received trace evidence from the murder scene. No evidence was found linking Plaintiff to her mother's death.

36.     On September 23, 2002, Best had a search warrant executed on a small fish pond across from Plaintiff's home. No evidence was found linking Plaintiff to any crime.

37.     On October 2, 2002, Best obtained a search warrant to obtain blood from Plaintiff. Best executed the search warrant on the next day and seized 1 vial of blood from Plaintiff.

38.     Best kept this blood and other evidence of Arlene Lincoln's murder in his car for several weeks. He delayed in relaying the DNA evidence until one month after Plaintiff's arrest.

39.     On October, 18, 2002, Best provided the SBI with items of evidence, which included *inter alia*: knife; scissors; cushions; pillow case; bed sheet; blanket; hairs; envelope with Gene Card; SBI Sexual Assault Kit from Arlene Lincoln; boots; purse; Stained Swabs, Control Swabs; and SBI Suspect kit from Plaintiff Leslie Lincoln, with a request to compare any blood found to both suspect (with Plaintiff the only named suspect) and victim, and to examine for DNA. Law enforcement switched this evidence in order to fabricate evidence against Plaintiff.

40.     On November 11, 2002, Plaintiff and her boyfriend, Richard Lee Manning, independently take and pass polygraph tests administered by retired SBI agent Steve Davenport. The defense promptly provided this information to the District Attorney.

41.     After Best has Plaintiff arrested, he tries to build this case around Plaintiff. Defendant Robb joins in this investigation with Best.

42.     Plaintiff always provided the truth to Best and Police. Plaintiff gave police all information requested including her checks, and receipts. With Defendant Best's guidance, Defendant Robb also concluded that Plaintiff killed her mother despite the total lack of forensic evidence linking her to the crime.

43.     Within a week of Plaintiff's arrest, Robb rushed Plaintiff's case through the grand jury in an attempt to keep Plaintiff from discovering the weakness of Best and Robb's case. Within two weeks of Plaintiff's arrest, Robb abused the power of her office by announcing she was seeking the death penalty against Plaintiff.

44.     The initial police investigation from the day Arlene Lincoln was found murdered uncovered witnesses' tips which, upon information and belief, were never fully investigated by investigators in this matter. These witnesses claimed to have seen an unknown white male in the area on the Sunday afternoon before Arlene Lincoln was murdered.

45.     One witness provided false information to Police, claiming to have heard someone in Arlene Lincoln's apartment, bumping or opening doors at around 6:00 a.m. the Monday morning her body was found.

46.     On Thursday, March 28, 2002, Leslie submitted to another approximately five-hour interview by Greenville Police and Defendant Best.

47. On April 15, 2002, Best obtained a videotape of the 3:55 a.m. March 18, 2002 transaction at Handy Mart gas station, involving the use of Arlene Lincoln's credit card. This video was never provided to Plaintiff despite formal and informal requests.

48. In an attempt to hamper Plaintiff's defense, Robb did not provide any discovery to Plaintiff for more than six months. On March 27, 2003, Robb provided Plaintiff approximately 169 pages of discovery.

49. No additional discovery was provided to Plaintiff for five additional months, when on August 26, 2003, Robb gave supplemental discovery to the defense which included the purported results of erroneous DNA tests. The report showed that the tests were conducted on June 3, 2003 and July 15, 2003 on evidence received October 18, 2002. The report revealed a failure to follow proper SBI and laboratory procedures; and it fundamentally, incorrectly and erroneously purported that the DNA found on the cushion and bed sheet matched Plaintiff's DNA as compared to others in the world's population 236 million trillion to 621 billion trillion times. These fundamentally flawed, meaningless numbers further reveal problems with competency within the North Carolina SBI Lab. Best's negligence and/or mishandling of the evidence was further exacerbated by the negligence, mishandling, complicity and failure to follow proper procedures by SBI Special Agent Brenda Bissette, who mislabeled, and misidentified Plaintiff's DNA, reporting false and incorrect DNA numbers wrongfully implicating Plaintiff in the murder of her mother.

50. In March 2004, Plaintiffs' defense attorney called the SBI requesting that the SBI Lab retest the DNA to insure no mistake was made. This request was rejected.

51. On November 23, 2004, an order was entered at the defense's request allowing Lab Corp. of Research Triangle Park to test the DNA evidence. As soon as financial and other

-11-

logistics were arranged, the evidence was submitted to Lab Corp., along with fresh DNA samples provided by Plaintiff at the request of the prosecutors and Lab Corp. At this time, apparently at the informal request of the State, the SBI Lab retested their original DNA samples.

52.     On March 3, 2005, the District Attorney notified defense by a telephone call that the SBI Lab admitted making a mistake in this matter concluding that the DNA identified in the erroneous SBI Lab report was not Plaintiff's DNA as previously reported.

53.     On March 8, 2005, and on other dates following, the defense informally requested formal SBI Lab reports noting the SBI's mistake so that the defense could determine the cause and extent of these fundamental mistakes made by the NC SBI Lab and to insure that criminal defendants in North Carolina can have confidence in the results of tests performed at the SBI laboratory. Defense attorneys, at this point, can no longer trust the competency of the NC SBI Lab to perform quality work, which protects the innocent from an improper conviction.

54.     Defendants Robb and Best continued to intentionally deprive Plaintiff of her constitutional rights and protections. On January 20, 2005, the defense filed an additional discovery request for prompt discovery of information related to scientific and DNA testing which Plaintiff knew to be false and flawed.

55.     On March 3, 2005, the SBI lab confirmed that a sworn law enforcement officer had altered the DNA tests.

56.     Defendant Robb continued to violate Plaintiff's statutory, regulatory and constitutional protections. Robb and Best delayed responding to several Motions for Discovery filed on behalf of the wrongfully accused, Leslie Lincoln.

57.     On March 8, 2005, approximately 30 months after Plaintiff was arrested and placed in jail, Robb provided Plaintiff with 712 pages of additional discovery which failed to

-12-

comply with the new discovery statute. This discovery also failed to provide any information regarding the flawed DNA tests, or the law enforcement procedures which led to the intentionally false DNA report. After Plaintiff's criminal defense attorney complained, Robb provided 498 additional pages of discovery on May 20, 2005, which still did not illuminate the cause and source of the erroneous DNA results.

58.     Upon receiving no assistance from Robb in determining the nature and extent of the flawed SBI Lab tests, Plaintiff investigated the matter using the limited tools available to her when confronted with uncooperative and dishonest government employees such as Robb and Best.

59.     Once Plaintiff, by way of Plaintiff's independent test, revealed the false DNA tests caused by a sworn law enforcement officer's intentional act, on or prior to May 5, 2005, Robb requested that the SBI Lab retest every item in Plaintiff's case.

60.     On May 13, 2005, at the request of Defendant Robb, the SBI lab picked up a number of items for retesting. None of this testing linked Plaintiff to any crime.

61.     The State cultivated, paid, nurtured, and ultimately came up with one or more jailhouse informants to testify against the defendant. The defense was not provided the names of all of these informants interviewed by the State. Upon learning of the alleged informants, counsel for the defense requested that the District Attorney not call said witnesses due to the inherent problems with the witnesses.

62.     Upon learning that no forensic evidence linked plaintiff to the crime, Defendants Robb and Best individually and collectively conspired and worked to cultivate false witnesses against the Plaintiff. By way of illustration, but not of exclusion, the following subparagraphs

-13-

reveal the length Robb, in her role as investigator, and Best worked to deny Plaintiff of her constitutional, statutory and regulatory protections.

a.     Defendants Robb and Best violated the rights of the Plaintiff and the North Carolina Code of Professional Responsibility which governs the behavior of attorneys within the State.

b.     Defendants Robb and Best investigated the possibility of false witnesses, traveling to see several possible jailhouse informants to "create" witnesses against Plaintiff. Best and Robb showed current and former inmates crime scene photos, and provided facts about the crime with which the Plaintiff was charged. This conduct was intended to contaminate the witnesses by providing the witnesses with inside information to which the witness can testify.

c.     In addition, Robb and Best told one or more jailhouse witnesses that things would go better for them if they did not let the defense know that they had spoke with them, thereby encouraging the witnesses not to speak with Plaintiff's counsel.

d.     Each of these informants cultivated by Robb and Best faced or had faced prosecution. One or more had a working relationship with the Greenville Police Department as an undercover confidential informant. These facts were intentionally not disclosed to Plaintiff while she faced charges, which if convicted, meant life in prison without the possibility of parole.

e.     For one or more jailhouse informants, serious felony charges were dismissed by Robb, thereby indebting the jailhouse informants to the district attorneys prosecuting Plaintiff.

-14-

f.    One cultivated witness investigated by Defendant Robb, Tandy L. Barnes, was an admitted addict, arrested in Pitt County on several serious felony charges to wit: Possession of Methamphetamine; Manufacturing Methamphetamine; Possession of Precursor Chemicals; Possession/Distributing Methamphetamine Precursor; and Maintaining a Dwelling for the Manufacture of Illegal Drugs.

g.    Barnes shared a cell with Plaintiff at the Pitt County Detention Center for 5 months. Plaintiff was released on bond on October 14, 2005, and placed on house arrest. On November 14, 2005, Barnes, who was desperate in jail according to her letters, wrote the District Attorney seeking favorable treatment. The District Attorney and Assistant District Attorney, Defendant Robb, promptly went to see Barnes at the Pitt County Detention Center, not waiting to discuss the matter with her attorney, Robert White. This was in violation of the Rules of Professional Conduct, which governs attorneys and protects the public and defendants against improper conduct.

h.    Barnes was planning to use Plaintiff as her "ticket out of jail." Despite being shown a letter revealing she planned to give perjured testimony, Defendant Robb called Barnes to testify falsely against Plaintiff.

i.    On or around November 19, 2005, Barnes told her father: "I'm working something else on my end here. I talked to the District Attorney. I'm going to testify against my ex-roommate, and the DA might help me out. The Das can't say they will do anything in return, because I will be asked about it on the stand, but they're going to be easy on me. They want me really bad.

-15-

j.     On November 20, 2005, Barnes wrote a friend of hers who knew Plaintiff to tell her she was "thinking about fuc[]ing Leslie. You know how the DA works. Favors for favors. The only thing is KARMA, I be doing some straight up evil..."

k.     A week later, Barnes told her father that she had sent the DA a letter stating that she would not testify unless she was allowed to go free.

l.     After Barnes met with Defendant Robb, Robb gave Barnes, a fugitive from Texas, an unsecured bond. On February 12, 2007, Robb dismissed all felony drug charges against Barnes for the following reason: "2005 case, no report received from law enforcement." This was a false statement, given that Plaintiff's defense attorney received such report from law enforcement who investigated Barnes' 2005 drug charges.

m.     Defendant Robb further abused her power by granting another favor to Barnes. On February 12, 2007, Robb allowed Barnes' boyfriend and co-defendant, Dennis Watson, a favorable plea to a lesser felony of Possession of Precursor Chemicals. This plea came after Barnes wrote Robb in March 2006, requesting favorable treatment for Dennis Watson.

n.     Another false witness purchased and cultivated by Defendants Robb and Best was Lauren Veros, who was charged with felony perjury after she was arrested on or around February 19, 2003, for obtaining property by false pretenses and common law forgery. At that time, Veros was a fugitive from New Jersey, facing felony heroin possession charges in Onslow County, North Carolina. In addition, she was facing various charges in Lenoir County, including giving false information to a police officer, and common law forgery.

-16-

o.      Veros was in jail under her given name of "Lauren Veros." On or around
April 4, 2003, Defendant Best went to see her at the jail and had her write out a statement
on which he allowed her to use a known alias, "Danielle Lauren Holsten." This
intentional misdirection was not corrected by Defendant Robb.

p.      After providing a statement against Plaintiff, Veros, a fugitive, received a
bond immediately. She was released on bond on the same day she gave her "known"
false statement against Plaintiff. Robb refused to provide Plaintiff this false statement for
almost two years.

q.      Once Veros was released from Pitt County jail, she was arrested in New
Jersey and returned to prison. On or around August 6, 2005, Robb and Best traveled to
New Jersey to interview Veros. This was done without the knowledge or permission of
Veros' attorney, Roddey M. Brown, III which is a violation of the Rules of Professional
Conduct. During this interview, Best conspired with Robb and took no notes. Robb was
acting as the investigator in this interview in an attempt to intentionally prohibit Plaintiff
from receiving full discovery pursuant to the new discovery statute, and violating
Plaintiff's state and federal constitutional rights.

r.      In September 2005, Robb met with Veros at the Edgecombe County
Detention Center, and told her that anyone who visited her there would have a contact
visit. Notes from this meeting, and information regarding this favor, were not provided
to the defense, which violated the discovery statutes of North Carolina. It also violated
United States Constitutional Protections afforded to the Plaintiff and other citizens of this
Nation under the "Law of the Land" Clause of Article I, Section 19 of the North Carolina
Constitution; Article I, Section 23 of the North Carolina Constitution; the Fifth, Sixth,

-17-

Eighth, and Fourteenth Amendments to the United States Constitution; and N.C.G.S. §15A-910.

     s.     In May 2007, to harm Plaintiff and pay Veros for her cooperation, Robb dismissed all Pitt County felony charges against Veros. The DA also contacted the Lenoir County District Attorney to assist Veros with her charges in that county. Veros entered pleas to reduced charges in Lenoir County. Robb never provided any discovery to Plaintiff regarding these actions.

     t.     On May 25, 2006, Robb prevented Veros from becoming a convicted perjurer by granting her another favor and dismissing the 2003 perjury case, stating for the record: "Case is over two years old. Defendant already served a significant prison sentence in another state."

     u.     The perjury charge was initiated April 4, 2003. On April 3, 2003 the State obtained a statement from Lauren Veros. The only reason the perjury case was over two years old was due to Defendant Robb's actions in not subjecting to trial a witness against Plaintiff. Robb also dismissed felony "obtaining property by false pretense," and "common law forgery" charges against Veros in exchange for her cooperation against Plaintiff, using the same reasons.

     v.     A third manufactured witness against Plaintiff was Benita Michelle Simms. Ms. Simms was in jail with Plaintiff, charged with murder. Defendant Best went to see Simms at the Pitt County Detention Center. Simms told Best that Plaintiff never confessed to her.

     w.     Simms plead to reduced charges of "accessory after the fact to second degree murder" on June 23, 2004. On August 18, 2005, again without notifying Simms'

attorney, Robb and Best went to see Simms at NCDOC for Women. Knowing that Simms suffered from mental deficiencies, the two showed her crime scene photos. This contaminated her possible testimony. It also upset Simms, who contacted her attorney and promptly provided him a statement in favor of Plaintiff.

       x.     Not satisfied with the information he received from Simms at NCDOC, Robb brought Simms to Pitt County, where she was rewarded with a lengthy contact visit with her mother in an effort to get her to testify against Plaintiff. This upset Simms so much that once again she called her attorney, Terry Alford, to advise him of the situation. Again, Robb never provided Plaintiff any discovery regarding these actions.

       y.     There were other witnesses who were treated in a similar fashion by Defendants Robb and Best, and Robb provided no discovery to Plaintiff regarding these witnesses.

       z.     Defendants Robb and Best performed other improper, illegal, and immoral acts against the Plaintiff in their conspiracy to convict this innocent woman. Both Robb and Best, at one time or another during their investigation, threatened witnesses and gave favors to witnesses once the witness was deemed to be cooperating.

      aa.     In one instance, during a meeting with a possible witness, Robb and Best showed the witness a statement of her husband where he admits to having an affair with the Plaintiff. This information was calculated and upset this witness in an attempt to get her angry at Plaintiff. This improper conduct could be used to impeach this witness and should have been disclosed by Robb pursuant to Brady. Additionally, both Robb and Best threatened John Flen with criminal prosecution if he did not tell them information harmful to Plaintiff.

-19-

bb.     Plaintiff's investigator located Arlene Lincoln's possible real killer. Robb

agreed to provide an independent investigator from outside of Greenville Police in

exchange for this information. When Plaintiff's attorney provided this information to

Robb, Robb promptly went to interview this suspect and told him that Plaintiff's lawyer

was trying to pin Arlene Lincoln's murder on him. This permanently damaged any

ability to get a confession from this suspect, who had given a known false statement to

the police within 24 hours of Arlene Lincoln's murder.

cc.     Defendant Best also falsely obtained search warrants in an attempt to

frame Plaintiff.

63.     As a result of the aforesaid false allegations made against the Plaintiff by

Defendants, a Magistrate issued a warrant for Plaintiff's arrest.

64.     As a result of the aforesaid false allegations made against the Plaintiff by

Defendants, a Grand Jury returned a True Bill Indictment against Plaintiff.

65.     Pursuant to said warrant, Greenville Police arrested Plaintiff and detained her

against her will for almost five years.

66.     Defendants falsely accused Plaintiff of murder. Defendants acted without

probable cause and with malicious intent to falsely prosecute Plaintiff when they knew or should

have known that Plaintiff had not committed the acts reported to the Magistrate.

67.     On March 23, 2007 Plaintiff was found not guilty of the aforesaid charge in Pitt

County Superior Court.

68.     As a direct result of Defendants' actions, Plaintiff suffered great humiliation,

embarrassment, emotional and mental suffering and was required to incur legal expenses in

Case 4:10-cv-00021-BO   Document 4   Filed 02/22/10   Page 20 of 29

defending against these false charges and having her record expunged in the amount in excess of $10,000.

**COUNT ONE**

**NEGLIGENCE**

69.    The allegations of paragraphs 1-68 above are realleged and incorporated herein by reference.

70.    Defendants were grossly negligent in the following respects:

a.    Prior to relating false information concerning Plaintiff to the Magistrate, Defendants knew or reasonably should have known that the allegation against Plaintiff was false;

b.    Prior to the trial Defendants knew or reasonably should have known that the allegation against Plaintiff was false;

c.    That at the time Defendants related false information to the Magistrate concerning Plaintiff, Defendants knew or should have known that Plaintiff had not committed the acts reported;

d.    That at the time Defendants related false information to the Grand Jury concerning Plaintiff, Defendants knew or should have known that Plaintiff had not committed the acts reported;

e.    Subsequent to Plaintiffs arrest but prior to Plaintiffs trial, Defendants knew or should have known that Plaintiff had not committed the acts reported, but notwithstanding said knowledge took no action to have the charges against Plaintiff dismissed, but instead required the Plaintiff to appear in Pitt County Superior Count with counsel and proceed with a trial.

-21-

71.     Defendant Simonowich negligently caused the above-described injuries to Plaintiff by failing to properly train, supervise, and control the conduct of Best and Police.

72.     Defendant Everett negligently caused the above-described injuries to Plaintiff by failing to properly train, supervise, and control the conduct of Robb.

73.     Greenville, Pitt County and Police Department negligently caused the above described injuries to Plaintiff by failing to properly train, supervise, and control the conduct of Best, Simonowich, Everett, and Robb.

74.     Greenville, Pitt County, and Police Department, as the employer of Best, Simonowich, Everett, and Robb, are liable under the doctrine of respondeat superior.

75.     Defendant SBI was negligent in analyzing and reporting the results of Plaintiff's DNA evidence. The erroneous DNA report revealed a failure to properly follow proper procedures and fundamentally, incorrectly, and erroneously purported that the DNA found at the murder scene matched Plaintiff's DNA.

## COUNT TWO

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

76.     The allegations of paragraphs 1-75 above are realleged and incorporated herein by reference.

77.     The above described improper investigation and cultivation of false witnesses constitutes intentional infliction of emotional distress against Plaintiff under the laws of North Carolina.

78.     Best and Robb, in conspiring to prosecute the Plaintiff for a crime she did not commit, acted in an extreme and outrageous manner, intentionally and with reckless disregard for Plaintiff's welfare, inflicting severe and permanent emotional distress on Plaintiff.

-22-

79.     It was reasonably foreseeable that these actions would cause the Plaintiff mental anguish and severe emotional distress.

80.     The actions of Defendants did in fact cause the Plaintiff mental anguish and severe emotional distress, as well as other injuries including reputational injuries, economic injuries, and disruption of her life.

## COUNT THREE

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

81.     The allegations of paragraphs 1-80 above are realleged and incorporated herein by reference.

82.     The actions of the Defendants Robb and Best in Count Two were, at least, grossly negligent and reckless with regard to Plaintiff's emotional state. These Defendants failed to exercise due care in discharging their duties.

83.     It was reasonably foreseeable that these negligent actions would cause the Plaintiff mental anguish and severe emotional distress.

84.     Defendant Simonowich negligently caused the above-described injuries to Plaintiff by failing to properly train, supervise, and control the conduct of Defendant Police Officers.

85.     Defendant Everett negligently caused the above-described injuries to Plaintiff by failing to properly train, supervise, and control the conduct of the assistant district attorneys.

86.     Pitt County, Greenville and Police Department, as the employers of Defendants Best, Simonowich, Everett, and Robb, are liable under the doctrine of respondeat superior for the negligent conduct of the individual Defendants.

## COUNT FOUR

## NEGLIGENT SUPERVISION OF EMPLOYEES

(Against Defendants Simonowich, Everett, Greenville Police Department, Pitt County, and SBI)

87.     The allegations of paragraphs 1-86 above are realleged and incorporated herein by reference.

88.     Joseph Simonowich, Police Chief, under color of law, intentionally, negligently, and with complete and deliberate indifference to Plaintiffs rights, caused Plaintiff to be deprived of her constitutional rights including but not limited to the Fourth, Fifth, Sixth, and Eighth amendments, by:

   a.     failing to supervise properly the training and conduct of Greenville Police Officers, including Best;

   b.     promulgating, issuing, teaching and implementing inadequate Police policies and procedures;

   c.     failing to enforce the laws of North Carolina and the provisions of the Constitution of the United States; and

   d.     upon information and belief, the issuance of vague, confusing, and contradictory policies concerning the use of force that are inconsistent with the requirements of the Fourth, Fifth, Sixth, and Eighth amendments of the United States Constitution.

89.     William Everett, District Attorney, under color of law, intentionally, negligently, and with complete and deliberate indifference to Plaintiff's rights, caused Plaintiff to be deprived of her constitutional rights including but not limited to the Fourth, Fifth, Sixth, and Eighth amendments, by:

   a.     failing to supervise properly the training and conduct of the assistant district attorneys, including Robb;

-24-

b.      failing to enforce the laws of North Carolina and the provisions of the
        Constitution of the United States.

90.     Greenville Police by and through the individual Defendants, under color of law,
intentionally, negligently, and with complete and deliberate indifference for Plaintiff's rights,
authorized, permitted, and tolerated the custom and practice of the unconstitutional and abuse of
authority by members of the Greenville Police Department, and, in particular by Best and other
Law Enforcement Officers; by failing to:

a.      appoint, promote, train, and supervise members of the Greenville Police
        Department who would enforce the laws in effect in North Carolina and who
        would protect the constitutional rights of the people of Greenville;

b.      require Chief of Police to promulgate procedures and policies for the investigation
        of major crimes that were consistent with the Fourth, Fifth, Sixth, and Eighth
        amendments of the Constitution; and

c.      by permitting the policy and custom of using improper, immoral, and illegal
        investigative techniques to exist and to be followed by the Greenville Police
        Department, thereby proximately causing the deprivation of Plaintiff's rights
        under the Fourth, Fifth, Sixth and Eighth amendments to the United States
        Constitution.

91.     The SBI by and through the individual Defendants, under color of law,
intentionally, negligently, and with complete and deliberate indifference for Plaintiff's rights,
authorized, permitted, and tolerated the custom and practice of the unconstitutional and abuse of
Process by Defendants Bissette, Best and other Law Enforcement Officers; by failing to:

-25-

a.      appoint, promote, train, and supervise special agents of the SBI who would
        enforce the laws in effect in North Carolina and who would protect the
        constitutional rights of the people of Greenville;

b.      require SBI to promulgate procedures and policies for the proper investigation of
        major crimes that were consistent with the Fourth, Fifth, Sixth, and Eighth
        amendments of the Constitution; and

c.      by permitting the policy and custom of using improper, immoral, and illegal
        investigative and laboratory procedures and techniques to exist and to be followed
        by the special agents of the SBI, thereby proximately causing the deprivation of
        Plaintiff's rights under the Fourth, Fifth, Sixth and Eighth amendments to the
        United States Constitution.

d.      failing to supervise properly the work of SBI special agents, including Bissette;

e.      promulgating, issuing, teaching and implementing inadequate laboratory policies
        and procedures;

f.      failing to enforce the laws of North Carolina and the provisions of the
        Constitution of the United States; and

g.      upon information and belief, the issuance of vague, confusing, and contradictory
        laboratory policies and procedures inconsistent with the requirements of the
        Fourth, Fifth, Sixth, and Eighth amendments of the United States Constitution.

## COUNT FIVE

## FALSE PUBLIC STATEMENTS IN VIOLATION OF 42 U.S.C. § 1983

92.     The allegations of paragraphs 1-91 above are realleged and incorporated herein by
reference.

93. Acting under color of law, Defendants made public accusations against Plaintiff that were knowingly false.

94. The actions of Defendants caused Plaintiff's name to be published on a public court calendar indicating that Plaintiff was accused of a crime.

95. In making these knowingly false statements, Defendants' actions were malicious and evidenced a callous and reckless disregard for, and deliberate indifference to, Plaintiff's constitutional rights.

96. As a direct and foreseeable consequence of these false statements, Plaintiff suffered injuries, including reputational injury, emotional harm, economic losses, and other harms.

## COUNT SIX

## VIOLATION OF AND CONSPIRACY TO VIOLATE FOURTEENTH AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983 – MALICIOUS INVESTIGATION

97. Paragraphs 1 through 96 are adopted and incorporated by reference.

98. Defendants were willing participants in a joint course of conduct, acting under color of law, to instigate, promote, facilitate, and prolong a malicious, bad faith criminal investigation of Plaintiff. The investigation violated Plaintiff's due process rights under the Fourteenth Amendment of the U.S. Constitution.

99. Among Defendants' malicious actions, the Defendants knowingly conspired to prosecute Plaintiff for a crime of which there was no evidence of her involvement, cultivated false witnesses, concealed exculpatory evidence, and vigorously pursued a criminal investigation that they knew to be unwarranted and baseless.

-27-

100. Defendants' actions, individually and jointly, were malicious and evidenced a callous disregard for, and deliberate indifference to, Plaintiff's constitutional rights.

101. Defendants' actions, individually and jointly, were performed in the scope of employment and in the scope of official duties.

102. As a direct and foreseeable consequence of Defendants' conduct, Plaintiff suffered severe and permanent emotional and mental pain and distress, economic damages, and reputational injury among other harms.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

103. Enter its judgment against Defendants, jointly and severally, in sums in excess of $10,000.00 as compensatory and punitive (as to the individual Defendants only) damages for the violation of Plaintiff's civil rights as alleged in Plaintiff's Claims for Relief;

104. Enter its judgment against Defendants, jointly and severally, in sums in excess of $10,000.00 as compensatory and punitive (as to the individual Defendants only) damages for Plaintiff's improper and false imprisonment as alleged in Plaintiff's Claim for Relief;

105. Enter its judgment against Defendants, jointly and severally, in sums in excess of $10,000.00 as compensatory and punitive (as to the individual Defendants only) damages for Defendants' intentional infliction of emotional distress upon the Plaintiff, as alleged in Plaintiff's Claim for Relief;

-28-

106.   Enter its judgment against Defendants, jointly and severally, in sums in excess of $10,000.00 as compensatory and punitive (as to the individual Defendants only) damages for Defendants' negligence, as alleged in Plaintiff's Claim for Relief;

107.   Award Plaintiff her costs herein, including reasonable attorneys' fees pursuant to 42 U.S.C. §1988; and

108.   For such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby requests a trial by jury on all claims so triable.

This the _11_ day of February, 2010.

KATHRYN FAGAN
Attorney for Plaintiff
State Bar #21858
P.O. Box 44
Manteo, NC 27954
(252) 947-0211
Kpfagan45@yahoo.com